## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TAMARA MELLON BRAND, LLC, | Case No. 15-12420 (KG) |
| Debtor.[1] | **Re: Docket No.: 3** |

### OBJECTION OF IPGL INVESTMENTS USA, INC., WILTON PLACE, INC. AND WESTERDALE, INC. TO CONFIRMATION OF DEBTOR'S PREPACKAGED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

IPGL Investments USA, Inc. ("IPGL"), Wilton Place, Inc. ("Wilton") and Westerdale Inc. ("Westerdale" and, collectively with IPGL and Wilton, the "Objecting Members") object to confirmation of the Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [D.I. 3] (the "Plan"). In support of the objection, the Objecting Members respectfully state as follows:

## I.    PRELIMINARY STATEMENT

1.    The Objecting Members are initial investors in and members of Tamara Mellon Brand, LLC (the "Debtor" or "TMB"). The Objecting Members' investments in the Debtor are subject to the terms of the Amended and Restated Limited Liability Company Operating Agreement of Tamara Mellon Brand, LLC (the "Operating Agreement"), which is attached as **Exhibit A**.

2.    Unfortunately, Tamara Mellon ("Mellon") has shown a consistent disregard for the Objecting Members' rights under the Operating Agreement. The proposed Plan is the culmination of that disregard.

---

[1]    The last four digits of the Debtor's federal tax identification number are 7426. The Debtor's address is 660 Madison Avenue, New York, NY 10065.

3.      Prior to the filing of this bankruptcy case, Mellon approved purported "loan" documents on behalf of the Debtor without the approval of the Board[2] ████████████████ ████████████.  The funds for such "loans" were advanced by Mellon, Canvas Service, LLC ("Canvas"), an entity owned by Mellon's paramour, Michael Ovitz (together with Canvas, "Ovitz"), and Sandbridge Consumer Fund I, LP ("Sandbridge" and, collectively with Ovitz and Mellon, the "Insiders"), an affiliate of Sandbridge Fund Acquisition, LLC, a member of the Debtor.

4.      Prior to the filing of the bankruptcy case, Mellon entered into a term sheet (the "Term Sheet") with New Enterprise Associates 15, Limited Partnership ("NEA"), which is the foundation of the proposed Plan.  The Term Sheet was entered into without the necessary approval of the Preferred Members, including the Objecting Members.  The Term Sheet provides the Insiders with cash and preferred stock in the reorganized entity while providing nothing for the Debtor's other investors, whose interests would be extinguished under the Plan.

5.      For multiple reasons, the Insiders' "loans" should be treated as equity interests. As a result, the consideration provided on account of those "loans" under the Plan should be distributed *pari passu* to all Preferred Members, including the Objecting Members.  For that reason alone, the Plan is not confirmable.

6.      Worse yet, the entire transaction upon which the Plan is based requires the approval of, among others, the Objecting Members ████████████████████.  The Objecting Members, however, do not consent to the transaction set forth in the Plan.  For that reason, the Plan also is not confirmable.

---

[2] Capitalized terms not otherwise defined shall have the meaning set forth in the Operating Agreement.

7.    The Plan also is not confirmable because it purports to release claims that should be pursued for the benefit of existing equity holders (including claims that are still subject to the 75-day challenge period in the DIP financing order).  To the extent the Plan purports to retain claims, it improperly provides that such claims are retained for the benefit of the reorganized Debtor even though such claims belong the estate and the proceeds thereof should be distributed to holders of Preferred Units.

## II.    FACTUAL BACKGROUND

### A.    The Debtor's Bankruptcy Case

8.    On December 2, 2015 (the "Petition Date"), the Debtor filed its voluntary petition under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

9.    Concurrent with the filing of the petition, the Debtor also filed the Plan and a Disclosure Statement for Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [D.I. 4] (the "Disclosure Statement").

### B.    The Objecting Members and the Insiders

10.    From March 2013 to the present, the Objecting Members have been (and are) Members and Preferred Members of TMB.  The Objecting Members invested an aggregate of Twelve Million Dollars in capital in TMB for an ownership interest of 25.63% of common stock. See Operating Agreement at Schedule 2.  In addition, Sandbridge Fund Acquisition, LLC, an affiliate of Sandbridge, and Mellon were also Members and Preferred Members of TMB at all times relevant.

11.    Importantly, the Objecting Members have held, and continue to hold after subsequent stock issuances, a majority of Preferred Units.  Therefore, the Objecting Members' approval is required for any transaction ██████████████████████████.

12.    The Objecting Members participated on the Debtor's Board.  David Ross, a principal of Westerdale, and Lord Jonathan Marland, a principal of Wilton, were appointed to the initial Board.  Due to Mellon's conduct, David Ross and Lord Marland resigned from the Board in or about May 2015.

13.    The Insiders also have Board representation.  Mellon served as the Chair of the Board from TMB's inception.   David Fife and Kenneth Suslow, who are principals of Sandbridge and Sandbridge Fund Acquisition, LLC, also were initial Board members.

14.    Ovitz was the paramour of Mellon, who was the founder, a Preferred Member, Chair of the Board, eponym and self-appointed CEO of TMB.  In addition, at Mellon's behest, Ovitz took an active role in the management of TMB including participating in calls and correspondence with Board members and Preferred Members.  Canvas, the entity which provided advances to the Debtor, is controlled and funded by Ovitz.  He also attended board meetings.

### C.    The Operating Agreement

15.    The original operating agreement for TMB was signed on January 15, 2013. Shortly thereafter, an initial round of funding was completed and the amended Operating Agreement was signed by the Debtors' Members, including, among others, Mellon, Sandbridge Fund Acquisition, LLC (an affiliate of Sandbridge), and the Objecting Members.

### 1.    ██████████ Insider Loans

██████The Operating Agreement contains several protective provisions that are applicable to this dispute. ████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

17.    Each of the Insiders is a Related Person as each is either ███████████████████

████████████████████████████████████████████████████████

██████████████████████

18.    A Member under the Operating Agreement is ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Operating Agreement p. 7.

The Members ████████████████ include all of the Objecting Members, Mellon and

Sandbridge Fund Acquisition, LLC.

19.    Mellon is a Member, which is sufficient to make her a Related Person.

20.    Sandbridge is an Affiliate of Sandbridge Fund Acquisition, LLC, a Member.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Id. at p. 2.

The general partner of Sandbridge is Sandbridge Capital, LLC, of which the managing partner is

David Fife.  Fife is also the President of Sandbridge Fund Acquisition, LLC.

21.    ████████████████████████, any loan from Mellon, Sandbridge or affiliates or

partners of Mellon or Sandbridge would have to be approved by the Board.

**2.** ███████████ **Required Consent of Preferred Members**

22. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

██ Those instances included, among others ████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████

██ ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

25. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

26.     The Preferred Members, ███████████████████████████████████████████

████████████████████████████, are ████████████████████████████████████████

██████████████████████████████████████████████████

27.     As indicated above, the Objecting Members held, and continue to hold, a majority of the Preferred Units.  Accordingly, any Sale Transaction requires the consent of the Objecting Members.

**D.     Mellon Ignored the Operating Agreement as She Mismanaged and Abused TMB and its Assets and Accepted Insider Advances without Approval.**

28.     As reflected on the Debtor's Declaration of Tamara Mellon in Support of First Day Motions [D.I. 6] (the "First Day Declaration"), TMB was "launched" in November 2013.

29.     By the end of 2014, TMB was nearly out of cash, due substantially to Mellon's waste and abuse.  For example, she put her personal driver and her life coach on TMB's payroll, took over $100,000 of TMB's product for herself and her daughter, and spent $100,000 on tickets for herself and Mr. Ovitz to attend the MET Gala, among other wasteful expenditures.

30.     In October 2014, Mellon agreed to, but then cancelled, a trip to England to meet with the Objecting Members to discuss financing options.

31.     In November 2014, Mellon cancelled, over the objections of David Ross, a scheduled Board meeting.  In fact, ████████████████████████████████████████████

████████████████████████████████████████████████ the last Board meeting for TMB was held in September 2014.  ██████████████████████[3]

---

[3] Mellon ignored other controls in the Operating Agreement for the benefit of the Debtor's Members.  For example,
████████████████████████████████████████████████████████████████████

32.     Further compounding the Debtor's problems, shortly after cancelling the November board meeting, Mellon, ███████████████████████████████,[4] unilaterally terminated the Debtor's chief financial officer, chief executive officer and chief operating officer and appointed herself the chief executive officer.  The Board was never asked to, and did not, approve the termination or appointment of any of these officers, despite having exclusive authority to do so.  Accordingly, the individuals purporting to act as the Debtor's officers were not properly appointed and lack authority.

33.     In addition to disregarding the rights of the Board and the Preferred Members, during the fall of 2014, Mellon began to abrogate her duties by allowing Ovitz, who had no position with TMB, to have a significant management role in TMB.  Ovitz attended Board meetings, participated in calls and responded to Board member inquiries.  In fact, when Ross expressed concerns regarding financing opportunities and the chain of command following the dismissal of many of the directors of TMB, it was Ovitz who replied.

34.     Despite her excessive spending, erratic behavior and repeated disregard for the Operating Agreement and the rights of the Board and Preferred Members, in December 2014, Mellon began requesting that Members make further investments in the Debtor.  While Mellon provided an initial term sheet to the Preferred Members, she failed – despite repeated promises -- to provide a business plan to support further investment in TMB.

35.     In late December, 2014, Mellon informed that Board that Ovitz would be providing financing and requested approval of a term sheet.  When the Board, including representatives of the Objecting Members, expressed concerns about some of the terms of the financing, Mellon again decided to take unilateral action without authority.  In January, 2015, the

---

[4] ███████████████████████████████████████████████████████████
███████████████████████████████████████ .

Board was informed through counsel that the Debtor had accepted a "loan" in the amount of $250,000 from Ovitz. There was no Board approval of the "loan".

36. Approximately one week later, Mellon requested that the Board and Objecting Members approve an additional One Million Dollars in funding from Ovitz. The Board requested additional financial information and a business plan from Mellon and suggested alternative terms for the financing. No information dissemination or discussion of alternate terms ever took place. Instead, Mellon again purported on behalf of TMB to accept Ovitz's funding without Board approval.

37. This pattern repeated itself again in May, 2015, when Mellon requested that the Board approve a proposed agreement for Insider Advances in the total amount of $2,500,000 (inclusive of prior advances) with $1,250,000 provided by Ovitz, $1,500,000 provided by Mellon and $250,000 provided by Sandbridge. The Board did not approve Mellon's request.

38. Although the Debtor's "first day" declaration and DIP financing motion are vague regarding the timelines of Insider Advances, it appears that as of the Petition Date, the Insider Advances had ballooned to $4.11 million. The Insider Advances were made without Board approval.

**E. The Term Sheet and Plan**

39. The proposed Plan is structured around exit financing from NEA. Attached to the Disclosure Statement, filed on the Petition Date, is the Term Sheet for Series A Preferred Stock Financing and Financial Restructuring (the "Term Sheet"). The Term Sheet sets forth the terms of the proposed agreement between NEA and the Debtor.[5]

---

[5] As the Term Sheet sets forth a significant and complicated financial transaction, it is clear that TMB and NEA agreed to the Term Sheet prior to the Petition Date.

40.    The Term Sheet treats the Insider Advances as loans in exchange for which the Insiders will receive cash and preferred stock in the Reorganized Debtor.  See Term Sheet p. 1.

41.    The Term Sheet requires Tamara Mellon to enter into negotiations regarding licensing of certain intellectual property that was licensed to the Debtor as of the Petition Date. *See* Term Sheet p. 3.

42.    The Term Sheet requires that "The Preferred Units and Common Units of TMB currently outstanding, and all warrants and options with respect thereto, will be cancelled, and no consideration will be distributed in respect thereof." Term Sheet pp. 1-2.  In addition, "TMB shall convert to a C-Corporation." Id. at p. 2.  The majority of voting equity in the new C-Corporation will not be held by the current equity holders.  Rather, as set forth in Exhibit A, the majority of voting equity will be held by a combination of Independent Third Parties including NEA, employees other than Mellon, other new money investors and the Insiders,  as specified in Exhibit A.   These transfers, resulting in the transfer of control of TMB to Independent Third Parties, constitute a "Sale Transaction" ██████████████████████████.

## III.    SUMMARY OF OBJECTIONS

43.    The Insider Advances should be treated as equity contributions because when made they were not loans permitted ██████████████████.  The Insider Advances should be characterized as equity contributions by Preferred Members (rather than loans) under bankruptcy law.  Accordingly, any property distributed under the Plan on account of the Insider Advances should be distributed *pari passu* to holders of Preferred Units in the Debtor.

44.    The Plan is not confirmable because the Term Sheet proposes a transaction that the Debtor cannot enter into without the approval of the Objecting Members ██████████████ ████████    The Objecting Members, however, do not approve the transaction set forth in the

Term Sheet.  The Objecting Members' governance rights are enforceable notwithstanding the Debtor's bankruptcy filing.  Accordingly, the Plan is unconfirmable because it is based on an unauthorized transaction.

45.      In addition, the Plan is not confirmable because it purports to release claims against a broad group of "Releasees" that should be pursued for the benefit of existing equity holders (including claims that are still subject to the 75-day challenge period in the DIP financing order).  All estate claims should be retained for the benefit of holders of Preferred Units (and then Common Units after payment of the Preferred Units' liquidation preference).

46.      Moreover, to the extent the Plan purports to retain claims, it improperly provides that such claims are retained for the benefit of the reorganized Debtor even though such claims belong the estate and the proceeds thereof should be distributed to holders of existing equity interests as unsecured creditors are unimpaired under the Plan.

47.      Finally, the Plan purports to "discharge" equity interests or to deem "cured" any defaults relating to equity interests.  Those concepts are not relevant to equity interests.

## IV.    OBJECTIONS

### A.    The Unauthorized Insider Advances Should Be Treated As Equity Contributions.

48.      The Insider Advances were made without the Board approval ████████ ██████████████████████████████████ and in violation of the Objecting Members' rights, through their Board representatives, to have a say in the terms of financings.

49.      The Insiders making the Insider Advances are charged with the knowledge of the terms of the Operating Agreement, including ████████████████████████████████ ████████.  The Insiders, however, made the Insider Advances without obtaining Board approval.  Thus, the Insider Advances are not loans ████████████████████.  The only

other potential ways to treat the Insider Advances are as gifts or equity contributions. Accordingly, the Insider Advances should be treated as equity contributions.

**B.     The Insider Advances Are Equity Contributions Under *SubMicron*.**

50.    The Insider Advances were infusions of cash from Mellon, who is a Member, Chair of the Board, and the founder of the Debtor; Ovitz, who is Mellon's paramour; and Sandbridge, an Affiliate of a Member.  As discussed below, the Insider Advances have all the hallmarks of equity contributions, not loans, and should be treated as such.

51.    The determination of whether a provision of funds to an insolvent company by an insider is a loan or an equity contribution is a factual determination.  <u>Cohen v. KB Mezzanine Fund II, (In re SubMicron Sys. Corp.)</u>, 432 F.3d 448, 457 (3d Cir. 2006).  Further it is a factual determination based on a case-by-case analysis.  The Third Circuit described it as follows:

> [T]he characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case.
>
> *            *            *
>
> Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.

<u>SubMicron</u>, 432 F.3d at 455-56.

52.    While <u>SubMicron</u> dictates that all pertinent facts should be considered, some factors addressed by courts in this jurisdiction include: "(1) the names given to the instruments, if

any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments." In re Moll Indus., Inc., 454 B.R. 574, 581-82 (Bankr. D. Del. 2011), citing In re Exide Techs., Inc., 299 B.R. 732, 740 (Bankr. D. Del. 2003).

53.    The first three factors set forth above generally go to the existence and terms of a purported loan agreement.   Here, while draft documentation was presented to the Board for at least some Insider Advances, the loans were made without Board approval, as required ███ ████████████████████████████████████████████████████████████ Were the Insiders truly concerned about repayment they would not have made a loan that had not been properly approved by TMB's Board.

54.    Indeed, it appears that the Debtor never made *any* payments – whether for principal or interest – on the Insider Advances.

55.    With respect to Insider Advances for which "loan" documents were drafted, the documents do provide for interest[6] payments and a stated maturity date.   Merely providing for interest, however, is insufficient evidence of a loan.   There was no expectation of receiving interest payments or timely repayment at maturity.   For example, the documents stated that the

---

[6] The Objecting Members have copies of proposed draft loan agreements indicating an interest rate of 6% per annum.  The Objecting Members do not know if this interest rate (or any interest rate) was applied to other Insider Advances.  The Disclosure Statement lacks any relevant information.

Insider Advances matured in or around 30 days.  Notwithstanding the Debtor's nonpayment, the

Insiders increased their advances to the Debtor, which started at $250,000 and apparently grew to

$3 million.  As noted in In re Friedman's Inc., 452 B.R. 512, 521 (Bankr. D. Del. 2011), "the lack

of demand of payment of interest … indicates that the Funding Participants were treating the

Notes as equity."  The same is true in this case.

56.    The fourth and seventh factors (source of repayment and security) also show that

the Insider Advances were intended as equity.  "If the expectation of repayment depends solely

on the success of the borrower's business, the transaction has the appearance of a capital

contribution."  In re AutoStyle Plastics, Inc., 269 F.3d 726, 751 (6th Cir. 2001).  As set forth

above, the loans were made on a 30-day basis to a Debtor who was insolvent.  As a result, the

Insiders could not be expecting repayment from revenue or non-existent profits.  Likewise, the

collateral which the Insiders took as security appears (based on draft documents) to be inventory

and receivables.  While the Debtor has not filed schedules to set forth the value of its receivables

and inventory, the value of such collateral was likely insufficient to repay the Insider Advances

as the Debtor was a "new" company.  Indeed, if the proceeds of receivables were sufficient to

repay Insider Advances, such proceeds likely would have been used for that purpose.  Instead,

the Debtor made no repayment of the Insider Advances.

57.    The fifth factor (inadequacy of capitalization) also supports treating the Insider

Advances as equity contributions, not loans.  The Debtor's inadequate capital is evidenced by the

fact that the Debtor filed bankruptcy less than a year after receiving the Insider Advances, while

having made no payments on the Insider Advances, and needing a capital infusion of $12 million

to emerge from bankruptcy.

58.     The sixth factor (identity of interest between the creditor and the stockholder) likewise shows that the Insider Advances should be considered equity investments.  The Insiders were: i) Tamara Mellon, the founder and largest shareholder of TMB; ii) an entity controlled by Mellon's paramour; and iii) Sandbridge, an entity who had two of its principals on the Board of TMB, and who was also an affiliate of a Member of TMB.

59.     Each of these Insiders is also an "insider" pursuant to the Bankruptcy Code.  For a corporation, 11 U.S.C. §101(31)(B) defines an "insider" to include: "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor."  Insider also includes the "managing agent of the debtor" under Section 101(31)(F).  However, this list is not exhaustive.  The question "is whether there is a close relationship between debtor and creditor and anything other than closeness to suggest that any transactions were not conducted at arm's length." In re Winstar Comm'cns, Inc., 554 F.3d 382, 396-97 (3d Cir. 2009); citing In re U.S. Med., 531 F.3d 1272, 1277 (10th Cir. 2008); see also S.Rep. No. 95–989, at 25 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5810 ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at [arm's] length with the debtor.").

60.     Here, Mellon was an officer, Manager and member of the Board of TMB.  As such she is "a person in control of the debtor" and a "managing agent of the debtor" within the statutory definition of insider.  Ovitz, while not a relative of Mellon, was her romantic partner, a "sufficiently close" relationship to subject the transactions between Ovitz and TMB to special scrutiny.

61.     Likewise the relationship between Sandbridge and the Debtor was very close. Suslow, who was on the Board of the Debtor, also served as the chair of the Investment Committee of Sandbridge.  Similarly Fife, who was also on the Board of the Debtor at the time of the Insider Advances, is the Managing Partner of the General Partner of Sandbridge.  Between them, Suslow and Fife wield considerable control over both the Debtor and Sandbridge.  In addition, Sandbridge is a corporate affiliate of Sandbridge Fund Acquisition, LLC, a Member and Preferred Member of the Debtor.

62.     Therefore, all of the Insiders were closely identified with Members and directors of the Debtor and their transactions should be subject to special scrutiny.[7]

63.     As TMB's search for capital appeared to largely focus on the Insiders, it is unclear if there were any lenders, outside of the Insiders, willing to provide funds to the Debtor on terms similar to those provided to the Insiders.  The lack of any third party financing, however, supports the characterization of the Insider Advances as equity investments.

64.     There was no "sinking fund" to make payments on the Insider Advances.  In fact, there was no meaningful source of such payments as demonstrated by the nonpayment of the Insider Advances.  That factor also weighs in favor of characterizing the Insider Advances as equity contributions.

65.     One additional factor that should be taken into consideration is the treatment of the Insider Advances under the Plan and Term Sheet which were negotiated by at least one and likely all of the Insiders.  Namely, the Plan and Term Sheet provide that the "loans" will largely be converted to (or effectively treated as) equity.  This suggests that the Insiders are (and always have been) happy to receive equity, instead of repayment, for their Insider Advances.

---

[7] Of course, the Insiders need not be "insiders" under the Bankruptcy Code in for their advances to be characterized as equity investments.  Their status as "insiders" under the Bankruptcy Code, however, explains why they would make equity investments in the Debtors.

66.     For the foregoing reasons, the Insider Advances should be characterized as equity. As such, the Plan cannot be confirmed as the treatment of the claims of the Preferred Member Insiders is radically different from that of other Preferred Members whose equity interests will be extinguished without distribution.  See Plan Art. III.D.3 & 5 and Term Sheet.  Thus, the Plan unfairly discriminates against the non-Insider Preferred Members and violates 11 U.S.C. § 1123(a)(4) ("[A] plan shall.. provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.")

### C.     The Debtor Did Not (and Does Not) Have the Requisite Authority to Enter Into the Term Sheet and the Transaction Contemplated Therein Because the Objecting Members Do Not Consent to the Transactions.

67.     As set forth above, Mellon has shown a determined disregard for the rights of the Preferred Members of TMB.  That disregard is further evidenced by the Debtor's purported agreement to the Term Sheet without the necessary approval from the Objecting Members (which hold a majority of the Preferred Units) ███████████████████████████.

68.     The entry into the Term Sheet without proper approval violates ████████ ███████████ the rights of the Objecting Members ████████, in three ways.  First, as addressed above, it provides payment in cash and equity for the unauthorized Insider Advances while cancelling all other equity interests.  Second, it provides for the sale or transfer of substantially of the TMB's assets to a new entity controlled by NEA without the approval of the Objecting Members ██████████████████████████████.  Thirdly, it requires a modification of the License Agreement without the approval of the Objecting Members ███████████████████████████.

69.     The Debtor has no authority to approve the Term Sheet or to consummate the transactions described therein because Mellon never obtained the approval of the Objecting Members (as majority holders of Preferred Units) █████████████████████████████████

█████████████████████

70.     Mellon appears to believe that the filing of a bankruptcy petition somehow gives legitimacy to the continued disregard of the terms of the Operating Agreement.  Bankruptcy, however, does not eliminate the Objecting Members' governance rights.

71.     As Judge Shannon recently declared in In re Indianapolis Downs, LLC, 486 B.R. 286 (Bankr. D. Del. 2013), "[i]t is axiomatic that the commencement of a Chapter 11 case does not suspend or displace non-bankruptcy law and contractual rights regarding corporate governance."  Id. at 302; see also In re Johns-Manville Corp., 801 F.2d 60, 64 (2d Cir. 1986) (the "right to govern" a corporation is "a prerogative ordinarily uncompromised by reorganization").

72.     The Delaware Supreme Court also has recognized that notwithstanding "insolvency," '[n]ormal corporate governance therefore continues."  See Saxon Indus., Inc. v. NKFW Partners, 488 A.2d 1298, 1302 (Del. Supr. 1984).

73.     The Delaware Chancery Court similarly has recognized that "corporate governance does not cease when a company files a petition under Chapter 11 and that issues of corporate governance are best left to the courts of the state of incorporation."  See also Fogel v. U.S. Energy Sys., Inc., C.A. No. 3271-CC, 2008 WL 15187, at *1 (Del. Ch. Jan. 15, 2008).[8]

---

[8] State law is "suspended 'only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress.'"  Chicago Title and Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp., 302 U.S. 120, 126 (1937) (quoting Stellwagen v. Clum, 245 U.S. 605, 613 (1918)).  "While Congress, under its Bankruptcy power, certainly has the constitutional prerogative to pre-empt the States, . . . the usual rule is that congressional intent to pre-empt will not be inferred lightly.  Pre-emption must either be explicit, or compelled due to an unavoidable conflict between the state law and the federal law.  Consideration of whether a state provision violates the supremacy clause starts with the basic assumption that Congress did not intend to displace state law."  Penn Terra, Ltd. v. Dept. of Envir. Res., 733 F.2d 267, 272-73 (3d Cir. 1984) (citations omitted).

Delaware's strong policy favoring freedom of contract in the context of LLC's also supports this Court's enforcement of the contractual corporate governance provisions set forth in the Operating Agreement.  See Elf Atochem N. Am., Inc. v. Jaffari, 727 A.2d 286, 291 (Del. 1999) (discussing "maximum effect" to be given to freedom of contract) (quoting 6 Del. C. § 18-1101(b)).[9]

74.    Therefore, the Term Sheet is unauthorized .  The Plan is unconformable because it is founded upon the unauthorized Term Sheet.

**D.    The Plan Must Provide that Any Recovery on Claims and Causes of Action Be Distributed to Holders of Existing Equity Interests.**

75.    A review of the Plan does make one thing clear:  The purpose of the Plan is to extinguish existing equity interests.  All creditors are unimpaired, except that the Insider Advances will receive new preferred stock and cash in satisfaction of the Insider Advances.

76.    Existing equity is extinguished although nonpriority unsecured creditors are getting paid in full and are unimpaired.  In other words, the Plan essentially assumes that the value of the Debtor is just enough to pay unsecured creditors in full, while leaving nothing for equity interest holders.[10]

77.    The Debtor's estate, however, has other assets that can be monetized for distribution to holders of existing equity interests.  Specifically, as indicated above, Mellon enjoyed the Debtor's assets as if they belonged to her.  The estate's claim against her for such

---

[9] Moreover, as a court of equity that is "guided by equitable principles", this Court should not countenance the disregard of the Objecting Members' governance rights.  See generally In re Kaiser Aluminum Corp., 456 F.3d 328, 330 (3d Cir. 2006).  Mellon and the other Insiders should not profit from their disregard of the Operating Agreement and the rights of other Members.

[10] The Debtor's liquidation analysis, however, provides for shareholders' equity of $35 million on the reorganized Debtors' opening balance sheet.  See Exhibit D to the Disclosure Statement.

mismanagement, waste, and abuse should be pursued for the benefit of the existing equity holders. The Plan, however, does not provide for the pursuit of such claims (which are not even mentioned in the Disclosure Statement). Instead, the Plan purports to release claims against Mellon and other "Releasees" without distributing value to the beneficiaries of those claims – equity interest holders.[11] See Plan at Art. VII.E., F., and G. Moreover, the purported release of those claims vitiates the seventy five (75) day challenge period in the final DIP order.

78.     Such claims should be transferred to a shareholder liquidation trust (which the Objecting Members can manage) for the benefit of holders of Preferred Units (and, after payment of their liquidation preference, Common Units).

**E.      To the Extent the Plan Provides for the Retention of Claims and Causes of Action, It Purports to Retain those Claims for the Benefit of the Reorganized Debtor While Existing Equity Interests are Being Extinguished.**

79.     To the extent that Plan provides for the retention of claims (such as claims against J. Choo USA, Inc.), see Plan at Art. IV.G., the Plan appears to provide that the reorganized debtor will reap the benefit of such estate causes of action even though equity interests are being extinguished. The proceeds of those estate claims must be distributed to holders of existing equity interests.

80.     Therefore, such claims should be transferred to a shareholder liquidation trust (which the Objecting Members can manage) for the benefit of holders of Preferred Units (and, after payment of their liquidation preference, Common Units).

**F.      The Plan Improperly Purports to (i) "Discharge" Equity Interests and (ii) Release Certain of the Debtor's Claims and Causes of Action Although Existing Interests Would Recover from Those Claims.**

---

[11] Notably, the Debtor's liquidation analysis (Exhibit D to the Disclosure Statement) does not mention, let alone contain any value for, claims against Mellon.

81.    The Plan purports to "discharge" equity interests or to deem "cured" any defaults relating to equity interests.  <u>See</u> Plan at Art. VII.C.  A discharge is an injunction relating to "claims."  <u>See</u> 11 U.S.C. § 524(a).  There is no discharge of interests, although they may be cancelled under a Plan.  There is nothing to "cure" with respect to the prepetition equity interests.

## V.    CONCLUSION

For the foregoing reasons, the Objecting Members respectfully request that this Court enter an Order (i) denying confirmation of the Plan and (ii) providing such further relief to the Objecting Members as is appropriate.  To the extent, if any, that the Court confirms the Plan (which is unconfirmable), (x) all property to be distributed on account of the Insider Advances should be distributed *pari passu* to all Preferred Members pursuant to the terms of the Operating Agreement, (y) all estate causes of action should be preserved (not released) and placed in a litigation trust for the benefit of existing shareholders, and (z) the text in the Plan regarding "discharging" or "curing" should not apply to equity interests.

Dated:  January 8, 2016
Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By:    */s/ Kurt F. Gwynne*_____
Kurt F. Gwynne (No. 3951)
Emily K. Devan (No. 6104)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575
Email:  kgwynne@reedsmith.com
        edevan@reedsmith.com

Counsel to IPGL Investments USA, Inc.,
Wilton Place, Inc. and Westerdale Inc.