## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TAMARA MELLON BRAND, LLC, | ) | Case No. 15-12420 (KG) |
| | ) | |
| Debtor.[1] | ) | **Re: D.I. 3, 61, 66, 84** |
| | ) | |

### DEBTOR'S REPLY TO THE OBJECTION OF IPGL INVESTMENTS USA, INC., WILTON PLACE, INC. AND WESTERDALE, INC. TO CONFIRMATION OF DEBTOR'S PREPACKAGED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Tamara Mellon Brand, LLC ("TMB" or the "Debtor"), the debtor and debtor in possession herein, hereby replies (the "Reply") in support of confirmation of the *Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on December 2, 2015 (D.I. 3) (the "Original Plan" and together with the supplement to the Original Plan, dated January 4, 2016 (D.I. 61) (the "Plan Supplement"), the "Plan") and in response to the *Objection of IPGL Investments USA, Inc., Wilton Place, Inc. and Westerdale, Inc.* (collectively, the "Objecting Members") *to Confirmation of Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 84) (the "Objection").[2]  In support of the Plan and this Reply, TMB respectfully states as follows:

### PRELIMINARY STATEMENT

1.     Stripped of its baseless allegations, mistaken facts, and misstatements of law, the Objection represents a reckless attempt by the Objecting Members to recover on their

---

[1]     The last four digits of the Debtor's federal tax identification number are 7426.  The Debtor's address is 660 Madison Avenue, New York, NY, 10065.

[2]     Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Plan or the Objection, as appropriate.

now worthless equity investments—investments that are worthless primarily because the Objecting Members themselves refused to support TMB when it needed them the most. With an entity that they admit in their own Objection is insolvent, the Objecting Members jeopardize a 100% recovery for the Debtor's general unsecured creditors to pursue a petty vendetta. Make no mistake, absent the confirmation of the Plan, the Debtor's business will fail and neither unsecured creditors nor equity holders will receive any distributions.

2.    What the Objecting Members continually fail to recognize is that start-up businesses, such as TMB, often require a great deal of money and nurturing to succeed. The founder, Tamara Mellon, and the other "Insiders" (as defined in the Objection)[3] had numerous discussions with the Objecting Members over the past year in an effort to reach some sort of arrangement for additional funding that would allow TMB to survive and the Objecting Members to retain their membership interests. At every step of the way, however, the Objecting Members made unreasonable demands—for example, blocking TMB from receiving any new investments unless such investors agreed to be subordinate to the Objecting Members' preferred membership interests—something to which no rational investor would ever agree.

3.    Thus, to save the company, TMB was forced to file this case to reorganize under Chapter 11 of the Bankruptcy Code. This allowed TMB to facilitate the investment of new capital under section 1123 of the Bankruptcy Code, which preempts the Objecting Members' veto rights under state law. This feature of the Bankruptcy Code exists for *precisely* this purpose: to allow struggling companies to find and have bankruptcy courts approve (as they do frequently) transactions in plans that otherwise would only be achievable through equity

---

[3]    The Objecting Members use of the term "Insiders" to refer to Tamara Mellon, Canvas Service, LLC ("Canvas"), and Sandbridge Consumer Fund I, LP ("Sandbridge"), but not themselves, is a bit disingenuous.

holder approval, which in many cases simply is not achievable. Clearly this approach is aimed squarely at the essential public policy behind the reorganizational scheme of the Bankruptcy code, allowing distressed businesses to attract new capital, continue to employ workers, continue to but goods from vendors and continue to satisfy customers and at the same time maximize value for stakeholders. As set forth more fully below, to suggest that a board needs equity holder approval even to propose a plan or transaction in the bankruptcy context turns routine Chapter 11 practice on its head and is contrary to the law.

4.      Moreover, TMB is reorganizing through a proposed investment by New Enterprise Associates 15, LP ("NEA") that enables TMB to pay its unsecured creditors in full—but only because TMB's secured creditors agreed to accept equity as part of their treatment under the Plan.[4]  To the extent that the Objecting Members complain about losing their investments in connection with this bankruptcy case, they only have themselves to blame.

### FACTUAL BACKGROUND

5.      TMB launched in November 2013 with the goal of delivering the finest Italian-made luxury shoes and other luxury eveningwear and accessories at half the price of traditional luxury brands. At launch, TMB followed the traditional business model in the fashion industry—releasing its collections months in advance of the wearing season with a large lead time from development to retail. However, in late 2014, Tamara Mellon and her advisors realized that the Debtor's traditional business model was unworkable in today's on-demand, internet-driven economy, especially for a small start-up like TMB.

6.      The Debtor thus began to lay the groundwork for the transition to a new business model. To properly transition to a "shop now, wear now" business model where new

---

[4]      Even the DIP Financing Claims are only being paid out over time under the Plan.

collections debut in the season they are meant to be worn, however, TMB required significant additional funding.  Unfortunately, the Objecting Members have, for reasons known only to them, stymied the company's attempt to reinvent itself at every turn—it is the Objecting Members' obstinacy that necessitated this bankruptcy.

7.    Since late 2014, the Objecting Members have refused either to help further fund TMB to enable it to successfully transition to its new business model or to allow new investors to invest money.  For example, in December 2014 and January 2015, the Objecting Members fought to prohibit the Debtor from entering into the Term Loan with the Term Loan Lenders until the agreement no longer provided for security interests in the intellectual property of the Debtor.  *See* **Ex. A** (Dec. 22, 2014 Email from Ms. Kight to Ms. Mellon; Dec. 23, 2014 Email from Ms. Kight to Ms. Mellon).

8.    After hearing the Objecting Members' concerns—that the Debtor's intellectual property rights "constitute[] substantially all of the assets of the Company," *see id.*— the Debtor was eventually able to receive bridge financing from one of the Term Loan Lenders after the Term Loan Agreement carved out the Debtor's intellectual property from any security interest, *see* **Ex. B** (Dec. 23, 2014 Email from Ms. Mellon to the Board of Directors; Jan. 6, 2015 Email from Ms. Mellon to the Board of Directors).

9.    During these negotiations, the Objecting Members never once argued that the entry into the Term Loan Agreement and its predecessor agreements with the Term Loan Lenders were somehow done without proper Board approval or for any improper purpose.  *See* **Ex. A**.  In fact, all relevant iterations of the Term Loan Agreement had proper Board approval. *See* **Ex. C** (Resolutions of the Board of Directors of TMB).

10.     Because TMB was arguably insolvent since December 2014, no rational investor would ever invest new money subordinate to the Objecting Members' membership interests.  This is why the bridge financing represented by the Term Loan was only provided on a secured debt basis.  However, the Term Loan was just a stopgap measure because, pursuant to the Operating Agreement, TMB could only borrow up to $5 million without putting it to a vote of the Preferred Members (a majority of whom consist of the obstructionist Objecting Members). *See* Operating Agreement § 4.16(j).  TMB found itself in an impossible bind.

11.     Fortunately, TMB was able to locate a new money investor in the form of NEA—the caveat being that the transaction would have to be implemented through a bankruptcy filing due to the Objecting Members' stubborn refusal to consent under Section 4.16 of the Operating Agreement.  Therefore, the Debtor proposed and solicited a Plan to implement the NEA transaction, and then commenced this bankruptcy case so that TMB could avail itself of section 1123(a) of the Bankruptcy Code, which expressly permits the Debtor to effectuate the transaction set forth in the Term Sheet through the confirmation of the Plan notwithstanding the state law rights of the Objecting Members.

## **REPLY**

12.     All that remains for TMB to successfully reorganize and pursue its new business model is for this Court to confirm the Plan.  The Objecting Members raise five grounds in their Objection in a misguided attempt to prevent this from happening.  None of them have any merit and the Plan should be confirmed.

### **I.     The Plan is Confirmable and the Term Sheet Did Not Violate Any Contract or Laws**

13.     The Objecting Members allege that the Plan cannot be confirmed because the entry into the Term Sheet was a violation of the Operating Agreement and thus void under applicable law.  *See* Objection, ¶¶ 67-74.  The Objecting Members rely on a mischaracterization

of the relevant facts and law to make this argument.  Section 4.16(c) of the Operating Agreement provides that "*effecting* any Sale Transaction…" requires the consent of a majority of the Preferred Members.[5]  Operating Agreement, § 4.16 (emphasis added).  "Effecting" is *not* "negotiating," "discussing," "planning," "contemplating" or "entering into a non-binding term sheet concerning."[6]  "Effecting" is a transitive verb (in gerund form) meaning "causing to come into being" or "putting into operation."  *See Webster's Third New International Dictionary (Unabridged)* 724 (1993).  Thus, entry into the Term Sheet and solicitation of the Plan could not have violated this provision.  The mere proposal of a transaction does not trigger the Preferred Members' right to vote pursuant to the clear and unambiguous language of section 4.16(c) of the Operating Agreement.  It is this Court that will be "effecting" the transaction set forth in the Term Sheet by confirming the Plan.

14.    Of course, the reason why the Objecting Members rely on attacking the Term Sheet and not the Plan itself is clear—despite all of their citations about the continuity of corporate governance in chapter 11, they fail to identify the critical statute and case law relevant to the confirmation of a plan.[7]

15.    Section 1123(a) of the Bankruptcy Code provides "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . . provide adequate means for the plan's

---

[5]    This, of course, presumes that the proposed transaction under the Plan is, in fact, a Sale Transaction, which the Debtor reserves all rights on.

[6]    The Term Sheet is non-binding by its terms.  *See Disclosure Statement*, **Ex. B**.  ("This term sheet is for discussion purposes only, and except as expressly set forth below, there is no obligation on the part of any negotiating party until a definitive stock purchase agreement is signed by all parties and other conditions set forth herein are met.").

[7]    Additionally, it is rather ironic that the Objecting Members complain about corporate governance in this case when they had the ability to participate on the Debtor's Board but resigned in May 2015.  *See* Objection, ¶ 12.  It was the Objecting Members' own actions that caused them to have no voice in the governance of the Debtor.

implementation . . . ." such as the "transfer of all or any part of the property of the estate to one or more entities." 11 U.S.C. § 1123(a)(5)(B). This statute is an *express Federal preemption* of state law on the subject. The authorities are quite clear that a bankruptcy court may authorize the transfer of property, among other things, pursuant to a plan *notwithstanding* the rights of equity under state statutes or contracts. *See, e.g., In re Federal-Mogul Global Inc.*, 684 F.3d 355, 369, 374 (3d Cir. 2012) ("We have specifically cited § 1123(a) as an instance where Congress used "explicit language" to demonstrate its intent "to displace state nonbankruptcy law."); *Universal Cooperatives, Inc. v. FCX, Inc. (In re FCX, Inc.)*, 853 F.2d 1149, 1154 (4th Cir.1988) (holding § 1123(a)(5)(D) overrides non-bankruptcy law "by its plain language."); *In re Stone & Webster, Inc.*, 286 B.R. 532, 543 (Bankr. D. Del. 2002) ("Section 1123(a) unequivocally states that the provisions which a plan shall contain is '[n]otwithstanding any otherwise applicable nonbankruptcy law.' The quoted language clearly means, and case law so holds, that the provisions of a plan as articulated in § 1123(a) can be effected without regard to otherwise applicable nonbankruptcy law, including the corporation law of the State of Delaware or any other state corporation laws having bearing on the debtors."); *In re Pacific Gas & Electric Co.*, 283 B.R. 41,47 (N.D.Cal. 2002) ("a review of the text and legislative history of [§ 1123(a)] demonstrates that Congress intended expressly to preempt non-bankruptcy laws that would otherwise apply to bar, among other things, transactions necessary to implement the reorganization plan.").

16.    This is settled, black-letter law for corporations and limited liability companies. For example, in *In re 431 W. Ponce De Leon, LLC*, 515 B.R. 660, 670 (Bankr. N.D. Ga. 2014), the debtors argued that the secured creditor's proposed chapter 11 plans did not "comply with Georgia [LLC] law because they provide the Liquidating Agent with an

irrevocable power of attorney which is not voluntary and make him the Manager of each of the Debtors post-confirmation." *Id*. The court disagreed and held that the plain language of section 1123(a) preempted Georgia's LLC law. *Id*. ("The Court agrees that the plain language of § 1123(a) preempts the corporate law relied upon by Debtors and this objection is without merit."). The Objecting Members' allegations in the instant matter are of a similar sort.

17.    The Objecting Members blithely ignore this fundamental aspect of the Bankruptcy Code and jurisprudence in a transparent, and unfortunate, attempt to shake down the company or some of its more responsible and supportive stakeholders for a payout to which they are simply not entitled. In doing so they cling to the thin reed of corporate governance in an argument, which when taken to its logical extreme would fundamentally alter the Court's ability—which is frequently exercised—to approve plans based on transactions in bankruptcy that outside bankruptcy would require equity approval. Thus, the Plan remains confirmable by this Court without the consent of the Objecting Members and this objection must be overruled.

**II.    The Term Loan Claims Cannot be Recharacterized**

18.    The Objecting Members are also trying to block the Plan by asking the court to treat or otherwise recharacterize the Term Loan Claims (referred to as the "Insider Advances" in the Objection), which are the impaired accepting class in the Plan, as equity contributions. *See* Objection, ¶ 48-66. But there are a multitude of problems with their theories—both factual and legal.[8]

---

[8]    There are procedural problems as well. As recharacterization is an equitable remedy, it should be brought by adversary proceeding unless included in a chapter 11 plan. Fed. R. Bankr. P. 7001(7). Additionally, as the debt allegedly subject to recharacterization is secured, any challenge to it must also be brought by adversary proceeding on this basis. Fed. R. Bankr. P. 7001(2).

19.    First and foremost, and in perhaps the most egregious of the spurious allegations in the Objection, the Term Loan *indisputably had Board approval* pursuant to the Operating Agreement.  For the Objecting Members to argue otherwise ignores the reality of which they are unavoidably aware.  As set forth in the Operating Agreement, only a majority of the Board was necessary to approve the loans.  Operating Agreement, § 5.02.  A majority of the Board voted for and approved of each of the advances.  *See* **Ex. C**.  Emails sent to representatives of the Objecting Members reflect this fact.  *See* **Ex. B**.

20.    Second, the approval of a majority of the preferred membership units of the Debtor was only required for loans in excess of $5 million.  Operating Agreement, § 4.16(j).  The Objecting Members admit that the Term Loan did not exceed that amount.  Objection, ¶ 38.  Thus, there is nothing in the relevant governing documents that could be used to invalidate the Term Loan, and the Objecting Members have made no allegations to the contrary.

21.    Third, the equitable doctrine of recharacterization is used by creditors to ensure that disguised equity financing does not have priority over true claims.  The Debtor has uncovered no reported cases in which *equity holders* have sought recharacterization to "drag" a documented secured loan "down to their level" priority-wise (and, of course, the Objection does not assert otherwise).[9]  This makes sense when reviewing the relevant factors in the case law cited by the Objecting Members and especially when considering the "commonsense" approach used by the Third Circuit.  *See Cohen v. KB Mezzanine Fund II, (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 455-57 (3d Cir. 2006) ("In defining the recharacterization inquiry, courts have adopted a variety of multi-factor tests borrowed from non-bankruptcy caselaw.  While these tests

---

[9]    In fact, the absence of case law on the subject tends to indicate that equity holders, such as the Objecting Members, likely do not have standing to raise such arguments.  As equity, the Objecting Members have expressly consented to be subordinate to any and all claims of the Debtor.  They cannot now change their minds.

undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else").

22.    For example, it defies logic for an equity holder to raise "inadequate capitalization" as a basis to recharacterize a secured creditor's loan when that same equity holder *would be just as responsible (if not more so)* for the alleged "inadequate capitalization" as the targeted creditor.  The argument that the Objecting Members can seek the recharacterization of a validly-authorized and fully-documented secured loan with a valid UCC-1 financing statement due to "inadequate capitalization" is absurd on its face and must be rejected by this Court.  To arrive at this result, the Objecting Members essentially advocate for a standard that is the very antithesis of *SubMicron*'s "commonsense" approach.

23.    The Objecting Members' analysis of other various recharacterization factors fares no better.[10]  First, the Objecting Members admit that the "first three factors set forth above generally go to the existence and terms of a purported loan agreement."  Objection, ¶ 53 (conceding that (1) the names given to the instruments evidence indebtedness, (2) the presence of

---

[10]    The factors used by the Objecting Members include:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*In re Moll Indus., Inc.*, 454 B.R. 574, 581-82 (Bankr. D. Del. 2011), *citing In re Exide Techs., Inc.*, 299 B.R. 732, 740 (Bankr. D. Del. 2003).

a fixed maturity date evidences indebtedness, and (3) the presence of a fixed rate of interest evidence indebtedness).

24.     Next, and contrary to the Objecting Members' allegations, the fourth and seventh factors (the source of repayment and the security for the advances) also do not support recharacterization.  The Term Loan Agreement clearly provides for repayment and delineates the security for such repayments.  To argue that the insolvency or near insolvency of the debtor is the test for these factors inappropriately conflates them with the fifth factor.  Additionally, as noted in the very case cited by the Objecting Members for some of these factors, "the extent to which [the Debtor] was in poor financial straits does not change the language of the agreements." *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 751 (6th Cir. 2001).  The same case also makes clear that, because the Term Loan Claims were secured, the seventh factor "cuts in favor of a loan." *Id*. at 752. [11]

25.     Moving on to some of the other factors, as noted above, the fifth factor (inadequacy of capitalization), makes no sense when the party seeking recharacterization would bear just as much fault for any alleged "inadequate capitalization."  The sixth factor (identity of interest) similarly supports treating the Term Loan Claims as debt.  The Objecting Members' argument as to this factor entirely misstates the appropriate analysis: the case law is clear that the "identity of interest" factor means recharacterization may be appropriate "[i]f stockholders make advances *in proportion to their respective stock ownership*," not just if some equity holders were the lenders.  *AutoStyle*, 269 F.3d at 751 (emphasis added).  As made clear in the Objection, only certain equity holders made the necessary loans to keep the company afloat—the Objecting Members abandoned the company in its time of need.  There is no proportionate ratio between

---

[11]     If the argument of the Objecting Members about insolvency as it relates to these factors is correct, it would eliminate the entire distressed lending industry.

the participants in the secured loans and the company's equity holders.  While the Objecting Members disingenuously argue to the contrary, applicable case law does not support recharacterization under such facts.  *See id.* ("a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt."); *see also United States v. State St. Bank & Trust Co.*, 520 B.R. 29, 77 (Bankr. D. Del. 2014) ("Court have considered "identity of interest" as a sign of equity when there is an exact correlation between the ownership interests of the equity holders and their proportionate share of the alleged loan").

26.    The last few factors briefly mentioned by the Objecting Members (the ability to obtain outside financing, the extent to which the advances were used to acquire capital assets, the extent to which advances were subordinated to other claims, and the presence or absence of a sinking fund) also do not help their case.  While TMB could not find outside financing and no capital assets were purchased with the Term Loan proceeds, the Term Loan was not subordinated to the claims of outside unsecured creditors but were, in fact, senior to unsecured claims.  The fact that the Plan now impairs the Term Loan Claims while unimpairing all other claims is irrelevant—it is the intent at the time of the transaction that controls.  *See SubMicron*, 432 F.3d at 457 ("the determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction.").  Additionally, a case cited by the Objecting Members makes clear that because the Term Loan was secured, the factor regarding a sinking fund is irrelevant.  *AutoStyle*, 269 F.3d at 753 ("the loans were secured with liens, which obviated any need for a sinking fund.").  None of these factors support recharacterization of the Term Loan.

27.    At bottom, the equity holders who did not lend money (*i.e.*, the Objecting Members) simply cannot prove any damages to justify the remedy of recharacterization—

without the Term Loan, their equity interests would have been worthless and extinguished nearly a year ago.  It would be, in fact, *inequitable* to allow equity holders *who failed to help* keep a company afloat to recharacterize the loans made by other equity holders *who did help* keep a company afloat.  Thus, the Court should reject this argument and rule that the Objecting Members cannot seek to recharacterize the Term Loan Claims because, among other things: (a) the Objecting Members do not have the requisite standing to raise recharacterization, (b) the Objecting Members suffered no damages from the Debtor's borrowings under the Term Loan, and (c) the Term Loan is and was intended to be valid and duly authorized debt of the Debtor.

### III.    The Debtor Releases in the Plan Are Necessary and Appropriate

28.    The next objection lodged by the Objecting Members is that they should receive any and all causes of action against Tamara Mellon, which are being waived and released by the Debtor in the Plan, since "[a]ll creditors are unimpaired" and the Plan "essentially assumes that the value of the Debtor is just enough to pay unsecured creditors in full." Objection, ¶¶ 75-78.  This allegation is absurd for several reasons.  First, the Term Loan Claims are impaired, and significantly so.  Absent the Exit Financing being provided by NEA and the Term Loan Lenders' agreement to equitize a portion of their loans, the Debtor's liabilities exceed its assets by well over $6 million.  Thus, existing equity is not "in the money" when it comes to any alleged claims of the Debtor against Tamara Mellon, and therefore they have no standing to argue that they should receive such potential causes of action.

29.    Second, as is well known by the Objecting Members, the Operating Agreement specifically disclaims all fiduciary duties for both Managers and Members of the Debtor to the fullest extent provided by law.  Operating Agreement, §§ 4.02, 5.01(a).  Therefore, there could be no derivative claims maintained against Ms. Mellon for any alleged breaches of

fiduciary duties to the company.[12]  The Objecting Members have articulated no claims against Tamara Mellon (or anyone else) that would require the Debtor to preserve such claims—which would be to the likely distraction of Ms. Mellon (the founder and creative engine behind TMB), whose undivided attention is necessary for this reorganization to succeed.  Moreover, the failure of the Objecting Members to support the company is not the fault of Tamara Mellon, nor can she be sued for such.

30.     Finally, and perhaps most importantly, Tamara Mellon, as the postpetition lender, received a release from the Debtor in partial consideration of her post-petition loans to the Debtor.  *See Order (A) Authorizing Debtor to Obtain Final Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364; (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter Into Ratification Agreement; and (D)  Granting Other Relief* (D.I. 55) (the "DIP Financing Order"),¶ 4.5.1.  This release was granted by the Court on December 22, 2015 on full and complete notice to the Objecting Members.  The only claims against Ms. Mellon remaining after the entry of the DIP Financing Order are those set forth in paragraph 4.1 of the same, which are limited to challenges to (i) the existence, validity or amount of the prepetition Term Loans; (ii) the extent, legality, validity, perfection or enforceability of the prepetition liens securing the Term Loans; and (iii) the application of proceeds.  DIP Financing Order, ¶ 4.1.  The Objecting Members failed to object to the financing and are barred from raising it now, as it has become a final order.

---

[12]     There are no other valid waste or mismanagement claims, as described by Ms. Mellon herself in a paper filed substantially contemporaneously herewith.  In fact, none of the spurious allegations in the Objection have any merit.

**IV.     The Retained Causes of Action Must Remain with the Debtor**

        31.    The fourth articulated basis for the Objection is related to the third, that the retained Causes of Action should be retained for the benefit of the Objecting Members (and other equity) and not for the Reorganized Debtor. *See* Objection, ¶¶ 79-80. Again, as noted above, absent the Exit Financing being provided by NEA and the Term Loan Lenders' agreement to equitize a portion of their loans, the Debtor's liabilities exceed its assets by well over $6 million. In fact, the Plan asserts that the value of the Debtor is less than $500,000 on a liquidation basis. *See* Disclosure Statement, **Ex. D** (Liquidation Analysis). Existing equity is not "in the money" when it comes to any retained Causes of Action and, as such, have no standing to argue that they should receive such Causes of Action. Instead, the retained Causes of Action are part of the assets being acquired in the deal with NEA and the consideration for the deal embodied by the Plan. This portion of the Objecting Members' Objection should be dismissed out of hand.

**V.     The Discharge Provision Is Appropriate**

        32.    The final ground raised by the Objecting Members to confirmation of the Plan is also incorrect. In the Objection, the Objecting Members allege that:

> The Plan purports to "discharge" equity interests or to deem "cured" any defaults relating to equity interests. See Plan at Art. VII.C. A discharge is an injunction relating to "claims." See 11 U.S.C. § 524(a). There is no discharge of interests, although they may be cancelled under a Plan. There is nothing to "cure" with respect to the prepetition equity interests.

Objection, ¶ 81. This objection is mistaken because section VII.C. of the Plan does not discharge "equity interests"—it discharges "Equity Interests." The distinction between an undefined term and a term defined by the Plan is an important one, which was apparently overlooked by the Objecting Members.

33.     Under the Plan, the definition of "Equity Interests" includes "any Claim against the Debtor subordinated pursuant to section 510(b) of the Bankruptcy Code."  Plan, § I.A.29.  Including claims based upon equity interests (which are subject to section 510(b) subordination) in a definition with equity interests is extraordinarily common in chapter 11 plans that provide no distributions to equity.  Of course, by including equity-based claims in the definition of "Equity Interests," a chapter 11 plan then must provide for the discharge of such equity-based claims; this is precisely what section VII.C. of the Plan does.  Thus, the language in section VII.C. of the Plan is correct, and the Objecting Members' objection to this provision should be overruled.[13]

Dated:  January 13, 2016
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Daniel B. Butz*
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
Tamara K. Minott (No. 5643)
1201 N. Market St., 16th Flr.
P.O. Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile:  (302) 658-3989
dabbott@mnat.com
dbutz@mnat.com
tminott@mnat.com

*Proposed Counsel for Debtor*
*and Debtor in Possession*

---

[13]     Additionally, as the various Preferred Units, Incentive Units, and Common Units of the Debtor are being cancelled by section IV.D. of the Plan, the Debtor fails to see the harm caused by the language of the discharge section of the Plan.